1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12   RYAN CORLEY, et al.,              Case No. 16-CV-00473-LHK
                                       Case No. 16-CV-02553-LHK
13              Plaintiffs,
                                       **ORDER GRANTING MOTIONS TO**
14        v.                           **SEVER**

15   GOOGLE, INC.,

16              Defendant.             Re: Dkt. No. 96 (No. 16-CV-00473-LHK)
                                       Re: Dkt. No. 20 (No. 16-CV-02553-LHK)
17

18   KEITH AMARAL, et al.,

19              Plaintiffs,

20        v.

21   GOOGLE, INC.,

22              Defendant.

23

24        Plaintiffs in these cases, *Corley v. Google, Inc.* ("*Corley*"), and *Amaral v. Google, Inc.*

25   ("*Amaral*"),[1] are 879 individuals who had Google Apps for Education accounts from November 1,

26

    ───────────────────
27   [1] All docket citations will be to the *Corley* case unless otherwise noted.
                                         1
28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

2010 to April 30, 2014.  Plaintiffs allege that Google, Inc. ("Google") violated the Wiretap Act by intercepting and scanning Plaintiffs' emails.  Before the Court are Google's motions to sever, filed in the *Corley* and *Amaral* cases.  ECF No. 19 ("FAC"); ECF No. 96 ("Mot."); 16-CV-2553, ECF No. 20.  With the Court's permission, Public Citizen, Inc. filed an amicus brief opposing Google's motion to sever.  Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Google's motions to sever.

## I.      BACKGROUND

### A.  Factual Background

Google offers customers a "suite of integrated Google products or services" known as "Google Apps."  FAC ¶ 10.  Google Apps for Education ("GAFE") is a customized "version of Google Apps that Google offers to universities and other educational institutions . . . for use by . . . students, faculty, and staff."  *Id.*  Among the products and services included in GAFE is Gmail, an email service.  *Id.*  GAFE users "receive email accounts and addresses with names that reflect the users' Educational Institution affiliation, not an association with Google—*e.g.*, jane.doe@berkeley.edu."  *Id.*

Plaintiffs aver that, from November 1, 2010 until April 30, 2014, Google "scann[ed] and process[ed] the content of every email received by or sent from a Google Apps for Education user account to develop sophisticated individual profiles for Commercial Purposes."  *Id.* ¶ 12.  These actions allegedly violated the Wiretap Act, which generally prohibits the interception of wire, oral, or electronic communications.  18 U.S.C. § 2511(1).

This is not the first time that GAFE users have brought a Wiretap Act claim against Google.  In *In re: Google Inc. Gmail Litigation* ("*Gmail*"), 13-MD-2430 (N.D. Cal.), a multidistrict litigation assigned to the undersigned judge, nine plaintiffs asserted a Wiretap Act claim on behalf of GAFE and non-GAFE Gmail users.

On October 25, 2013, plaintiffs in *Gmail* moved for "certification of . . . four classes and three subclasses."  *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, *10 (N.D. Cal. Mar. 18,

2

2014).  One such sub-class, the "Education Class," sought to represent "[a]ll Google Apps for Education users who have, through their Google Apps for Education accounts, sent an email to an '@gmail.com' address or have received an email."  *Id.*

In denying class certification to the Education Class, the Court first noted that the Wiretap Act is not violated if either party to a communication consents to its interception.  With this exemption in mind, the Court went on to note that, in order to create a Gmail account, all Gmail users—both GAFE and non-GAFE—had to agree to Google's Terms of Service ("TOS") and Privacy Policy.  *Id.* at *3.

From April 16, 2007 to March 1, 2012, Google's TOS stated that it would "pre-screen, review, filter, modify, refuse or remove any or all Content from any Service"—including Gmail—in order to monitor "objectionable" content.  *Id.*  From 2010 to March 1, 2012, Google's Privacy Policy stated that, "when you send email or other communications to Google, we may retain those communications in order to process your inquiries, respond to your requests and improve our services."  *Id.* at *4.

After March 1, 2012, Google amended its TOS such that all Gmail users would now have to agree to "give Google . . . a worldwide license to use . . . and distribute [user] content."  *Id.* at *3.  The Privacy Policy also changed on March 1, 2012, and "stated that Google could collect information that users provided to Google, cookies, log information, user communications to Google, information that users provide to affiliated sites, and the links that a user follows."  *Id.*

In April 2014, after this Court's *Gmail* order, Google amended its Privacy Policy to state that the email of GAFE and non-GAFE users would be analyzed.  *Matera v. Google, Inc.*, 15-CV-4062 (N.D. Cal.), ECF No. 20-2 at 3 ("Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection.  This analysis occurs as the content is sent, received, and when it is stored.").

In addition, from 2011 to 2012, Google also maintained a "Privacy Center" website which

stated that "Google scans the text of Gmail messages in order to filter spam and detect viruses. The Gmail filtering system also scans keywords in users' email which are then used to match and serve ads." 2014 WL 1102660, *5. From 2009 to 2014, Google maintained other webpages, blogs, and online tools to provide information on its interception and scanning practices. *See id.* at *4–*5. There was also media coverage of Google's scanning practices, including New York Times, National Public Radio, and Washington Post articles and reports. *Id.* at *7.

Aside from these generally applicable disclosures that were made to all Gmail users (both GAFE and non-GAFE), each educational institution appeared to have a unique privacy policy. As noted in *Gmail*, "the educational institutions with whom Google contracted were . . . required to obtain the necessary authorizations from end users for Google to provide its services." *Id.* at *5. These authorizations were to disclose, at the very least, the TOS and Privacy Policies described above. However, because Google had a separate contract with each educational institution, "Google [did] not mandate how these educational institutions receive[d] such authorizations, nor [was] that process uniform between various educational institutions." *Id.* There were "substantial differences between how each of the [educational] institutions approache[d] disclosures," and "it is unclear . . . what disclosures . . . each [GAFE] user saw before registering for an account." *Id.*; *see also id.* at *15 ("Google had no single policy that required all Google Apps Administrators to provide the same disclosures to end users.").

"Some institutions' disclosures [were] quite explicit. For example, Western Piedmont Community College [told] its users that 'Google does use software or a "bot" to scan Gmail emails for key words for the purposes of targeted advertising.' Similarly, the University of Alaska state[d] that 'For use in targeted advertising on Google's other sites, and if your email is not encrypted, software (not a person) does scan your mail and compile keywords for advertising.' Meanwhile, other universities, such as the University of the Pacific, merely incorporate[d] Google's disclosures by citing to the TOS and Privacy Policies." *Id.* (citations and alterations omitted). Moreover, "it is not clear that end users even had to look at these disclosures before they

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

could create their accounts." *Id.* As a final point, Google contends that, pursuant to certain contractual terms, many educational institutions chose to have "advertisements in GAFE . . . off by default, meaning that advertisements were not displayed to GAFE users unless the GAFE institution affirmatively decided to allow them. Moreover, if a GAFE institution did not affirmatively enable advertisements, any automated scanning of GAFE emails was not used to serve targeted ads in GAFE Gmail or in any other Google service, nor were any 'advertising profiles' made." ECF No. 66 at 4 (footnote omitted).

In light of these circumstances, this Court concluded in *Gmail* that whether a GAFE user had consented to the interception of his or her communications—and thus whether Google had violated the Wiretap Act—was a question that "must be litigated on an individual, rather than classwide basis." 2014 WL 1102660, *14. Accordingly, plaintiffs in *Gmail* had failed to satisfy Federal Rule of Civil Procedure 23(b)(3), which states that a court may certify a damages class only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Following the Court's class certification ruling, only the individual plaintiffs' individual claims remained. Google and the individual plaintiffs settled the individual claims and filed stipulations of dismissal as to all cases. The case was closed on July 14, 2014.

### B. Procedural History

On January 27, 2016, Plaintiffs filed the original complaint in *Corley*. ECF No. 1. There were four Plaintiffs in the original complaint, all of whom were current or former students of the University of California, Berkeley ("Berkeley"). These Plaintiffs were Ryan Corley, William Dormann, Shannon Mehaffey, and Teddey Xiao. On February 8, 2016, Plaintiffs' counsel filed a notice of voluntary dismissal as to Teddey Xiao. ECF No. 12.

*Corley* was originally assigned to U.S. Magistrate Judge Nathanael Cousins, but was related to *Gmail*, and reassigned to the undersigned judge on February 12, 2016. On March 11, 2016, Plaintiffs' counsel in *Corley* sought leave to file the FAC in order to add "an additional 700

5

1    plaintiffs."  ECF No. 18 at 2.  On March 16, 2016, without obtaining leave from the Court,

2    Plaintiffs' counsel filed the FAC.

3           Because this Court had not previously overseen a case involving more than 700 Plaintiffs,

4    the Court set an initial case management conference for April 20, 2016 to discuss with the parties

5    "how best to manage this case" going forward.  ECF No. 58 at 2.

6           In the parties' case management statement, Plaintiffs proposed a discovery plan in which

7    Plaintiffs' counsel wanted to proceed effectively as a class action: "Discovery should proceed as to

8    . . . a representative sample of the Plaintiffs . . . [which] should help to value and settle any

9    remaining cases."  ECF No. 66 at 13.

10          At the case management conference itself, Plaintiffs' counsel acknowledged that the *Gmail*

11   class certification order influenced Plaintiffs' decision to bring an action with 700 individual

12   Plaintiffs.  ECF No. 74-1 ("Hr'g Tr.") at 5 ("There are issues raised by your [*Gmail*] order that are

13   in play, yes.").  Further, when asked why Plaintiffs' counsel did not file individual cases,

14   Plaintiffs' counsel stated that "[t]hey're all the same essential claim arising out of the same

15   essential facts."  *Id.* at 9.

16          However, on consent, Plaintiffs' counsel acknowledged that "[t]here may be differences

17   based on school" in terms of what information each Plaintiff saw and what each Plaintiff knew

18   about Google's email scanning practices.  *Id.* at 9.  Plaintiffs' counsel conceded that "consent may

19   be individual in certain ways," and there "may be some unique differences based on who read

20   what [and] when that are totally individual."  *Id.* at 8, 9.  Plaintiffs' counsel thus acknowledged

21   that the predominance issues in *Gmail* would also be an issue in *Corley*.

22          In addition, Google argued that the FAC lacked sufficient information as to each Plaintiff.

23   The FAC did not, for instance, give "individual e-mail addresses" for each Plaintiff.  *Id.* at 34.

24   Without this information, Google could not gather data or determine how to marshal a proper

25   defense as to each Plaintiff.  *See id.* at 15 ("There's a lot of just basic biographical data that we

26   would want to get our hands on sooner than later.").

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   During the case management conference, the Court commented that the FAC appeared to

2   be "trying to circumvent Rule 23," the Federal Rule of Civil Procedure governing class

3   certification. *Id.* at 42.

4   At the April 20, 2016 initial case management conference, Google stated that it had ceased

5   scanning emails of GAFE users on April 30, 2014. *Id.* at 17.  The Wiretap Act is subject to a two-

6   year statute of limitations.  Accordingly, Plaintiffs' counsel stated, also at the initial case

7   management conference, that he would file another case which would allege a Wiretap Act claim

8   against Google by several hundred more plaintiffs. *Id.* at 23 (Google's counsel noting that he

9   understood that Plaintiffs' counsel would "add another 100 or 200 people to the case); *id.* at 32

10  (Plaintiffs' counsel stating that he had 855 total clients, of which approximately 700 were named

11  in the FAC).  The Court responded that Plaintiffs could not file such an action in federal court,

12  because doing so would be "improper."  Hr'g Tr. at 33.  Plaintiffs' counsel then stated that he

13  would "file it in Superior Court and presumably Google will remove it." *Id.* at 32.

14  Following the initial case management conference, the Court ordered the parties to file

15  briefs addressing the propriety of mass joinder.  ECF No. 69 at 1.  The Court also scheduled a

16  further case management conference for April 28, 2016. *Id.*  Plaintiffs filed their brief on mass

17  joinder on April 25, 2016, ECF No. 74, and Google filed its brief on April 26, 2016, ECF No. 77.

18  At the April 28, 2016 case management conference, Plaintiffs' counsel confirmed that he

19  would file a separate action with more than a hundred Plaintiffs in state court. *See also* ECF No.

20  85 at 4 (Plaintiffs' counsel stating that he would "file [the additional] claims separately in state

21  court.").  After reviewing the parties' briefs and learning about Plaintiffs' counsel's decision to file

22  a separate action in state court, the Court invited Google at the April 28, 2016 case management

23  conference to file a motion to sever.  ECF No. 85.

24  Plaintiffs' subsequently filed a case with 175 Plaintiffs—*Amaral*—in Santa Clara County

25  Superior Court on April 29, 2016.  Google removed *Amaral* to federal court on May 11, 2016, and

26  *Amaral* was related to *Corley* on May 18, 2016.  16-CV-2553, ECF Nos. 1 & 15.

27

28  Case No. 16-CV-00473-LHK
    Case No. 16-CV-02553-LHK
    ORDER GRANTING MOTIONS TO SEVER

7

1    Google moved to sever on May 18, 2016 in *Corley* and on June 1, 2016 in *Amaral*.

2    Google's motion in *Amaral* states that "the Court should . . . sever the claims of the individual

3    Plaintiffs in the present *Amaral* complaint" for "all the reasons set forth in the *Corley* Motion."

4    16-CV-2553, ECF No. 20 at 2.  There is no independent legal analysis in the *Amaral* motion.

5    Plaintiffs filed responses to both motions on July 6, 2016, and Google filed its replies on July 27,

6    2016.  ECF No. 121 ("Opp'n"); ECF No. 123 ("Reply").  On June 21, 2016, Public Citizen, Inc.

7    ("Public Citizen") moved to file an amicus brief opposing Google's motion to sever.  ECF No.

8    114.  The Court granted Public Citizen's motion on June 23, 2016, and Public Citizen filed its

9    amicus brief on June 24, 2016.  ECF No. 118 ("Public Citizen Opp'n").  The Court held a case

10   management conference on August 18, 2016 addressing options to move this litigation forward if

11   the Court were to find misjoinder.  ECF No. 133.

12   **II.     LEGAL STANDARD**

13       Under Federal Rule of Civil Procedure 20(a), permissive joinder of plaintiffs is appropriate

14   where (1) "any right to relief [is asserted] jointly, severally, or in the alternative with respect to or

15   arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2),

16   "any question of law or fact common to all plaintiffs will arise in the action."  Fed. R. Civ. P.

17   20(a).  "Even once these requirements are met, a district court must examine whether permissive

18   joinder would comport with the principles of fundamental fairness or would result in prejudice to

19   either side."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (internal

20   quotation marks omitted).  "A determination on the question of joinder of parties lies within the

21   discretion of the district court."  *Wynn v. Nat. Broadcasting Co.*, 234 F. Supp. 2d 1067, 1078 (C.D.

22   Cal. 2002); *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 522 (5th Cir.

23   2010) (per curiam) ("[D]istrict courts have considerable discretion to deny joinder when it would

24   not facilitate judicial economy and when different witnesses and documentary proof would be

25   required for plaintiffs' claims.").  The rules regarding permissive joinder are "to be construed

26   liberally in order to promote trial convenience and to expedite the final determination of disputes."

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

8

1    *League to Save Lake Tahoe v. Tahoe Reg. Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977).

2    **III.    DISCUSSION**

3           The Court begins by examining the first Rule 20(a) requirement—whether Plaintiffs' right

4    to relief arises out of the same transaction, occurrence, or series of transactions or occurrences.[2]

5    Because Plaintiffs have not met this requirement, the Court need not consider whether Plaintiffs

6    satisfy the second Rule 20(a) requirement: that there be a common question of law or fact.  Aside

7    from these two Rule 20(a) requirements, the Court also explains why mass joinder would be

8    fundamentally unfair.  Finally, the Court addresses how this litigation should move forward.

9           **A.  Same Transaction or Occurrence Requirement**

10                  **1.  Legal Framework**

11          On the same transaction or occurrence requirement, the Ninth Circuit has held that "this

12   provision requires factual similarity in the allegations supporting [p]laintiffs' claims."  *Visendi v.*

13   *Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013).  Other courts have likewise determined that

14   there must be a logical relationship between events, *In re Prempro Prods. Liab. Litig.*, 591 F.3d

15   613, 622 (8th Cir. 2010), and "that joinder is not appropriate where different products or processes

16   are involved," *In re EMC Corp.*, 677 F.3d 1351, 1359 (Fed. Cir. 2012).

17          With this guidance in mind, the Ninth Circuit, in *Visendi v. Bank of America*, determined

18   that joinder was improper where a group of 160 named plaintiffs sued 15 different defendants for

19   illicit lending practices.  733 F.3d at 866.  The *Visendi* court held that plaintiffs' "loans [had been]

20   secured by separate properties scattered across the country, and some of the properties, but not all,

21   [had been] sold in foreclosure."  *Id.* at 870.  Thus, "[w]hile Plaintiffs allege in conclusory fashion

22   that [d]efendants' misconduct was 'regular and systematic,' their interactions with [d]efendants

23   were not [in fact] uniform."  *Id.*  Accordingly, the *Visendi* court determined that plaintiffs'

24   allegations did not arise from a single transaction or occurrence: they arose from different loans,

25

26   _____

27   [2] In this Order, the Court abbreviates this requirement as the "same transaction or occurrence" requirement.

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

United States District Court
Northern District of California

1   made by different lenders, on different properties, in different parts of the country.

2       Similarly, in *Coughlin v. Rogers*, 130 F.3d 1348 (9th Cir. 1997), 49 plaintiffs brought suit

3   against the Immigration and Naturalization Service ("INS") and its then-Director, Richard Rogers.

4   *Id.* at 1349.  The gist of plaintiffs' complaint was that "defendants have unreasonably delayed

5   [the] adjudicat[ion] [of] plaintiffs' applications and petitions."  *Id.*  These applications and

6   petitions, however, were significantly different from one another.  Some petitions had been made

7   by U.S. citizens, others by aliens.  Some applications sought relief for the applicant, while others

8   sought relief for a spouse or child.  On these facts, the district court found that plaintiffs' claims

9   did not arise from the same transaction or occurrence: "[e]ach [p]laintiff has waited a different

10  length of time, suffering a different duration of alleged delay."  *Id.* at 1350.  "Furthermore, the

11  delay is disputed in some instances and varies from case to case.  And, most importantly, there

12  may be numerous reasons for the alleged delay."  *Id.*  Thus, "[e]ach" plaintiff's claim "raises

13  potentially different issues, and must be viewed in a separate and individual light by the [c]ourt."

14  *Id.* at 1351.  On appeal, the Ninth Circuit held that the district court's ruling was consistent "with

15  Federal Rules of Civil Procedure 20 and 21 and the precedent on severance."  *Id.*

16      Although the Ninth Circuit has not addressed the propriety of joinder in a case involving as

17  many as 879 Plaintiffs, several district courts in the Ninth Circuit have done so.  In *On the Cheap,*

18  *LLC v. Does 1–5011*, 280 F.R.D. 500 (N.D. Cal. 2011), for example, the district court held that

19  plaintiff had failed to satisfy the same transaction or occurrence requirement in bringing suit

20  against 5000 Doe defendants over copyright infringement.  As the court pointed out, defendants in

21  *On the Cheap* would "likely raise different factual and legal defenses," because the allegations

22  made against them were all somewhat different.  *Id.*  "Because the large number of defendants

23  with individual issues will create 'scores of mini-trials involving different evidence and testimony'

24  and complicate the issues for all those involved, it is more efficient to proceed with separate cases

25  where there will be separate proceedings, including separate motion hearings and ADR efforts."

26  *Id.* at 503.  Other district courts are in accord with the reasoning in *On the Cheap*.  *See, e.g.*, *WiAV*

27

28  Case No. 16-CV-00473-LHK
    Case No. 16-CV-02553-LHK
    ORDER GRANTING MOTIONS TO SEVER

10

*Networks, LLC v. 3Com Corp.*, 2010 WL 3895047, *2 (N.D. Cal. Oct. 1, 2010) ("Each defendant has simply been thrown into a mass pit with others to suit plaintiff's convenience.  In this connection, the accused defendants—who will surely have competing interests and strategies—are also entitled to present individualized assaults on questions of non-infringement, invalidity, and claim construction").[3]

In addition, consistent with *On the Cheap*, a number of circuit courts have found joinder of hundreds or thousands of parties inappropriate.  In *AF Holdings, LLC v. Does 1–1058*, 752 F.3d 990 (D.C. Cir. 2014), for example, the D.C. Circuit rejected plaintiffs' attempt to join 1058 Doe defendants together for purposes of asserting a copyright infringement claim.  As in *On the Cheap*, the crux of plaintiffs' contention in *AF Holdings* was that plaintiffs owned a copyrighted work which had been downloaded numerous times by defendants through an online filesharing program. As the D.C. Circuit explained, two "users who download the same file months apart are like two individuals who play at the same blackjack table at different times.  They may have won the same amount of money, employed the same strategy, and perhaps even played with the same dealer, but they have still engaged in entirely separate transactions.  And simply committing the same type of violation in the same way does not link defendants together for the purposes of joinder." *Id.* at 997–98 (internal quotation marks and alteration omitted).

Looking outside the filesharing context, in *Acevedo v. Allsup's Convenience Stores, Inc.*, the Fifth Circuit determined that the district court properly exercised its discretion in denying joinder to 800 "current or former employees of Allsup's Convenience Stores."  600 F.3d at 518.

---

[3] The Court notes that the FAC names 200,000 Doe Defendants.  The FAC makes no specific allegations as to these Doe Defendants.  It simply states that these Defendants are "principals, agents, partners, affiliates, officers, directors, shareholders, creditors, members, employees, managers, joint venturers, co-venturers, and/or co-conspirators . . . and were act[ing] within the . . . scope of their agency" in assisting Google.  FAC ¶ 5.  The holding in *On the Cheap*—that 5,000 Doe defendants were unmanageable and were misjoined—may therefore apply with equal or greater force here, where there are 200,000 Doe Defendants.  Moreover, under Ninth Circuit law, "[a]s a general rule, the use of 'John Doe' to identify a defendant is not favored."  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Google, however, does not move for misjoinder of Defendants, but reserves the right to do so at a later time. Mot. at 7 n.5.  Under these circumstances, the Court does not address misjoinder of Doe Defendants at this time.

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

1   These 800 employees sought to bring wage and hour claims against defendant.  As the Fifth

2   Circuit pointed out, however, "plaintiffs work or have worked across a network of more than 300

3   stores, each with its own manager responsible for implementing Allsup's policies."  *Id.* at 522.

4   "[C]onditions do not appear to have been uniform at all Allsup's stores."  *Id.*  Thus, "given the

5   divergent working conditions at each store and the different defenses applicable to each

6   plaintiff's claims," mass joinder was improper.  *Id.*; *see also id.* (noting that joinder would be

7   inefficient, as it would be "too challenging logistically").  Notably, the Fifth Circuit observed that

8   plaintiffs in *Acevedo* had "fail[ed] to cite any cases in which a group of plaintiffs even remotely as

9   numerous as 800 were able to join their claims."  *Id.*

10      Two common themes link *Visendi*, *Coughlin*, *On the Cheap*, *AF Holdings*, and *Acevedo*

11   together.  First, the single transaction or occurrence requirement is not met where plaintiffs would

12   have to prove their claims or defendants would have to litigate their defenses on an individualized

13   basis.  Second, the impropriety of joinder is magnified in situations where there are hundreds or

14   thousands of parties, as these situations burden, rather than facilitate, judicial economy.

15      **2.  Application**

16      These two principles govern the Court's disposition of the instant motions.  As noted in

17   *Gmail*, "[t]he question of whether Class members have consented to the alleged interceptions has

18   been central to this case since its inception."  2014 WL 1102660, *13; *see also id.* ("The consent

19   exception remains one of the principal disputed issues in this case.").  Consent is also central to

20   the instant actions: Google has, since the initial case management conference, stated that it would

21   challenge whether Plaintiffs had consented to Google's interception and scanning practices.

22   Consent may be either express or implied, but both express and implied consent are questions of

23   fact.  *Id.* at *15 ("[T]he question of express consent is usually a question of fact, where a fact-

24   finder needs to interpret the express terms of any agreements to determine whether these

25   agreements adequately notify individuals regarding the interceptions."); *id.* at *16 ("Implied

26   consent is an intensely factual question that requires consideration of the circumstances

27

28   Case No. 16-CV-00473-LHK
    Case No. 16-CV-02553-LHK
    ORDER GRANTING MOTIONS TO SEVER

12

surrounding the interception to divine whether the party whose communication was intercepted was on notice that the communication would be intercepted.").

The fact-specific nature of the consent inquiry defeated class certification in *Gmail*, as "[t]he individualized questions with respect to consent, which will likely be Google's principal affirmative defense, [were] likely to overwhelm any common issues." *Id.* at *21. This inquiry also defeats mass joinder here. The "intensely individualized" nature of consent means that the 879 Plaintiffs' individual claims do not satisfy the same transaction or occurrence requirement. The consent analysis instead requires an examination of many different transactions or occurrences.

Indeed, consent is particularly fraught as it applies to GAFE users, because each educational institution had a unique contract with Google. This is a fact that Plaintiffs' counsel acknowledged at the initial case management conference: "consent may be individual in certain ways," and "there may be differences based on school, there may be differences based on time period, there may be some unique differences based on who read what [and] when that are totally individual." Hr'g Tr. at 5–6.

These differences are also readily apparent from the FAC in the instant cases: "Google did not mandate how these Educational Institutions obtained these authorizations, and the disclosures and authorizations regarding GAFE naturally varied by school." FAC ¶ 20. The FAC further alleges that, "many Educational Institutions directed students to the school's own privacy or use policies, some to Terms of use specifically agreed-upon by the Education Institution and Google, others to the Google Apps for Education Terms of Service and/or Privacy Policy, yet others to the general Google Terms of Service and/or Privacy Policies." *Id.* ¶ 21.

The FAC describes the variations in the disclosures of some educational institutions. For example, in response to whether Google would "search our mail for marketing purposes," the University of Maine ("Maine") stated: "No. The education agreement prohibits that activity." *Id.* ¶ 23(7). The University of Arizona ("UA") stated that "CatMail allows you to send and receive

13

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

1 email with all the Google tools . . . plus full privacy of your information and no ads."  *Id.* ¶ 23(6).

2 It is unclear whether "full privacy" included privacy from email scanning.  Similarly, Google's

3 contract with Yale University ("Yale") "guarantee[d] privacy and confidentiality in ways that are

4 analogous to the way Yale currently provides email services," but did not identify what privacy

5 protections Yale's current email service provided.  *Id.* ¶ 23(5).

6          Aside from institutions like Maine, UA, and Yale, the FAC also states that some

7 educational institutions simply "directed students to . . . the general Google Terms of Service

8 and/or Privacy Policy."  FAC ¶ 21.  Those TOS and Privacy Policies, however, changed multiple

9 times between 2010 and 2014.  On March 1, 2012, Google amended its TOS such that all Gmail

10 users would now have to agree to "give Google . . . a worldwide license to use . . . and distribute

11 [user] content."  *Id.* at *3.  2014 WL 1102660, *3.  That same day, the Privacy Policy was also

12 changed to state "that Google could collect information that users provided to Google, cookies,

13 log information, user communications to Google, information that users provide to affiliated sites,

14 and the links that a user follows."  *Id.*[4]  The Privacy Policy was changed again in April 2014, after

15 the Court's *Gmail* class certification order, to inform users that "[o]ur automated systems analyze

16 your content (including emails) to provide you personally relevant product features, such as

17 customized search results, tailored advertising, and spam and malware detection."  15-CV-4062,

18 ECF No. 20-2 at 3.  Thus, any analysis of consent would have to address the specific TOS and

19 Privacy Policies in effect at specific times.

20          Finally, according to Google, many educational institutions agreed, as a default, that

21 GAFE users would not be subject to targeted advertising and that Google would not scan email

22 sent or received by a GAFE user.  *See* ECF No. 66 at 4 ("[I]f a GAFE institution did not

23 affirmatively enable advertisements, any automated scanning of GAFE emails was not used to

24

25 ──────────────────

[4] In *In re Google, Inc.*, 2013 WL 5423918, *14 (N.D. Cal. Sept. 26, 2013), the Court held that "a
26 reasonable Gmail user [who] read" the amendments to the TOS and Privacy Policy on March 1,
2012 "would not have necessarily [have] understood that her emails were being intercepted to
27 create user profiles or to provide targeted advertisements."

28 Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

serve targeted ads in GAFE Gmail or in any other Google service, nor were any 'advertising profiles' made.").  In order to enable scanning, the educational institutions themselves or GAFE users at these educational institutions had to affirmatively change these default settings.

This dissimilarity reflects the individual contracts that each educational institution had with Google.  *See* FAC ¶ 23(12) ("NYU Google Apps for education is offered by Google to NYU *in accordance with a specially negotiated end-user license agreement*.") (emphasis added).  These differences impacted what Google scanned and analyzed, what disclosures each Plaintiff read, and whether any particular Plaintiff consented to Google's practices.  As this Court has explained in *Gmail*, the "consent of Education Class members is likely to require individualized inquiries. . . . Google had no single policy that required all Google Apps Administrators to provide the same disclosures to end users.  This means that the end users received vastly different disclosures depending on with which educational institution they were affiliated."  2014 WL 1102660, *15. Put another way, each school had its own contract with Google, and these contracts appear to have provided different disclosures.

Based on this information, Plaintiffs at each educational institution (1) might not have consented to Google's scanning practices, (2) might have opted out of Google's scanning practices by changing their Gmail settings or choosing a different email provider, or (3) might have consented to Google's scanning practices.  As Google notes, in order to defend itself, Google would need to undertake "a highly individualized" analysis to investigate, research, and present defenses as to each Plaintiff.  Mot. at 10.  This type of investigation made class treatment inappropriate.  It also makes mass joinder inappropriate.  For the 879 Plaintiffs, spread across twenty one educational institutions, Google would need to answer a set of different questions. These questions might include:

- Did a particular Plaintiff's educational institution have a specific privacy policy, or did it direct users to Google's general TOS and Privacy Policies?
- What did each institution's privacy policy disclose or authorize?

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

- Did the particular Plaintiff actually read the policies at issue?
- Did an educational institution's privacy policies change over time?  Which version or versions of an educational institution's privacy policy did the particular Plaintiff read?
- Did an educational institution allow its users to change GAFE settings to prevent or enable email scanning?
- Did the particular Plaintiff hear about Google's interception practices from any another source, such as a Gmail-related privacy notice or a publicly-available news article?

Courts have recognized that the predominance analysis under Rule 23(b) and the single transaction or occurrence analysis under Rule 20(a) may, in some instances, be two sides of the same coin.  In *In re EMC Corp.*, for instance, defendants sought to sever themselves from eighteen other companies that were named in a single complaint.  677 F.3d at 1353.  In evaluating defendants' arguments, the Federal Circuit examined an "analogous" Fifth Circuit decision where the Fifth Circuit had determined that plaintiffs had "not established that the questions of law or fact common to the members of the class predominate over any questions affecting individual members as required by Rule 23(b)(3)."  *Id.* at 1355.  The Federal Circuit acknowledged that "[t]he procedural safeguards pertaining to class certification do not [technically] apply" in a joinder case.  *Id.*  Nevertheless, as the Federal Circuit explained, "Rule 20's requirements are designed to prevent similar unfairness."  *Id.*  "Like the requirements of Rule 23 in class actions, Rule 20's two requirements—that the claims share questions of law or fact common to all defendants, and arise out of the same transaction or occurrence—help ensure that the scope of the action remains consistent with fairness to the parties."  *Id.* (internal quotation marks and alterations omitted).

Here, the reasoning in *In re EMC* is particularly relevant because Plaintiffs' counsel has acknowledged that the *Corley* and *Amaral* cases are "much like . . . class action[s]."  ECF No. 74 at 7.  Plaintiffs' counsel, moreover, has acknowledged that the *Corley* and *Amaral* cases were brought to avoid the reach of *Gmail*.  In opposing the instant motions, for instance, Plaintiffs'

16

United States District Court
Northern District of California

1   counsel has stated that "Plaintiffs seek to litigate their claims . . . consistent with the law, *in light*

2   *of the unavailability of class treatment.*"  Opp'n at 1 (emphasis added).  Moreover, Plaintiffs'

3   counsel has stated that discovery should proceed in a manner that mimics discovery in a class

4   action: "[d]iscovery should . . . focus on a representative sample of Plaintiffs," which would

5   culminate in a limited set of "bellwether trials."  ECF No. 131 at 4.  Plaintiffs concede that

6   "[d]eposing all 879 Plaintiffs before trying the first case is a waste of resources for the Parties and

7   the Court."  *Id.*

8       Given these circumstances, the Court's Rule 23(b)(3) predominance analysis and Rule

9   20(a) same transaction or occurrence analysis reach the same result.  As before in *Gmail*, Google

10   must have the opportunity to fully and fairly litigate against each Plaintiff in this case.  That

11   opportunity allows Google to review and present defenses against each Plaintiff, given the

12   individualized nature of the consent exemption.  Thus, the Wiretap Act claims of the 879 Plaintiffs

13   do not arise from the same transaction or occurrence, and Plaintiffs have been misjoined.

14   **3.  Plaintiffs' and Public Citizen's Contentions**

15       Plaintiffs and Public Citizen present three arguments in response to this conclusion.  First,

16   they point out that some courts have denied class certification but have nonetheless found joinder

17   to be appropriate.  Second, Plaintiffs and Public Citizen argue that Rule 20(a) is satisfied because

18   "Google had a uniform policy of intercepting and processing the content of . . . email[]."  Public

19   Citizen Opp'n at 7.  Third, Plaintiffs and Public Citizen cite the Court's prior rulings in the

20   *McAfee v. Francis* litigation.  As discussed below, these arguments lack merit.

21   **a.  Predominance and Joinder**

22       According to Public Citizen, the Court's predominance analysis in *Gmail* does not

23   necessarily foreclose joinder here.  To support this point, Public Citizen cites several cases where

24   courts "have allowed joinder under Rule 20 after denying class certification under Rule 23."

25   Public Citizen Opp'n at 5.

26       In *Bryant v. Service Corp. International*, 801 F. Supp. 2d 898, 900 (N.D. Cal. 2011), the

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

17

court denied class certification to a putative class of current and former Service Corp. employees. There were twelve plaintiffs in *Bryant*. After the court denied class certification, the court severed the eight plaintiffs who did not reside in California. The district court, in its discretion, declined to sever the four California plaintiffs. Similarly, in *Rochlin v. Cincinnati Insurance Co.*, 2003 WL 21852341, *3–*4 (S.D. Ind. July 8, 2003), *Weigele v. FedEx Ground Package System, Inc.*, 2010 WL 3069213, *1 (S.D. Cal. Aug. 4, 2010), and *Luna v. Del Monte Fresh Produce (Southeast), Inc.*, 2009 WL 4801357, *1 (N.D. Ga. Dec. 10, 2009), the courts agreed to join 9, 25, and 52 employees of a single employer, respectively.

None of the foregoing cases involved an attempt to join 879 Plaintiffs at 21 different educational institutions together. The largest number any court permitted in terms of joinder was 52, in *Luna*. Furthermore, these cases involve employees suing the same employer for wage, hour, or other labor violations. In such circumstances, the parties may well be able "to take advantage of the efficiencies of common discovery and joint proceedings"—there might have, for instance, been a single employment contract or collective bargaining agreement. *Weigele*, 2010 WL 3069213, *2. In the instant actions, on the other hand, there are no such economies of scale. There are 21 contracts, one for each educational institution. There is uncertainty as to what each Plaintiff saw, whether a Plaintiff agreed to a particular disclosure, and whether a Plaintiff might have learned about Google's practices from other sources, such as media coverage. Plaintiffs' counsel conceded this point and stated at the initial case management conference that "consent may be individual in certain ways," and there "may be some unique differences based on who read what [and] when that are totally individual." Hr'g Tr. at 8, 9. Based upon these differences, Google intends to examine each Plaintiff's Wiretap Act claim on an individualized basis in order to determine whether a Plaintiff expressly or impliedly consented to Google's practices. The employer-employee cases cited by Public Citizen are therefore inapposite, and the Court declines to follow them here.

**b.  Uniform Policy**

18

1    Next, Plaintiffs and Public Citizen claim that Google had a uniform policy of intercepting

2    and scanning email.  However, Google contends that, "[s]ince GAFE was launched,

3    advertisements in GAFE Gmail have been off by default, meaning that advertisements were not

4    displayed to GAFE users unless the GAFE institution affirmatively decided to allow them.

5    Moreover, if a GAFE institution did not affirmatively enable advertisements, any automated

6    scanning of GAFE emails was not used to serve targeted ads in GAFE Gmail or in any other

7    Google service, nor were any 'advertising profiles' made."  ECF No. 66 at 4 (footnote omitted).

8    Thus, different educational institutions may have had different scanning policies.

9        Furthermore, even if Google had a uniform scanning policy across all educational

10   institutions, each educational institution had its own privacy policy that included different

11   authorizations and disclosures.  The instant actions are therefore distinguishable from three

12   decisions cited by Plaintiffs and Public Citizen: *United States v. Mississippi*, 380 U.S. 128 (1965),

13   *Nelson-Devlin v. Eli Lilly and Co.*, 2015 WL 5436700 (E.D. Cal. Sept. 15, 2015), and *Allen v.*

14   *Similasan Corp.*, 2013 WL 2120825 (S.D. Cal. May 14, 2013).

15       In *Mississippi*, plaintiff alleged that Mississippi had implemented a systemic, uniform plan

16   to restrict the African American vote, implemented via certain statewide voting procedures.  The

17   U.S. Supreme Court held that joinder of six county registrars was proper because "the registrars

18   had acted and were continuing to act as part of a state-wide system designed to enforce the

19   registration laws in a way that would . . . deprive colored people of the right to vote."  380 U.S. at

20   142.  Similarly, in *Nelson-Devlin*, the district court found joinder of plaintiffs proper because the

21   warnings accompanying prescriptions of a specific drug were found to be identical.  Likewise, in

22   *Allen*, the plaintiffs had purchased the same product after reviewing the same "product[]

23   packaging" and the same advertisements on a website.  2013 WL 2120825, *2.

24       Unlike this trio of cases, the instant cases involve potentially different scanning policies

25   across different educational institutions as well as different authorizations and disclosures.

26   Consequently, legal authority upholding joinder in *Mississippi*, *Nelson-Devlin*, and *Allen*, which

27

28

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

involved a uniform policy, is inapplicable here.

### c. *McAfee* Litigation

Finally, Plaintiffs and Public Citizen make much of this Court's decisions in *McAfee v. Francis*. In *McAfee v. Francis* ("*McAfee I*"), 2011 WL 3293759 (N.D. Cal. Aug 1, 2011), three plaintiffs originally brought breach of contract claims against a single defendant. The Court granted defendant's motion to dismiss without prejudice because plaintiffs did not contest defendant's arguments on the merits; plaintiffs simply requested leave to amend. In dicta, the Court observed that joinder appeared improper because it appeared that the plaintiffs had separate contracts with defendant. *Id.* at *3.

Plaintiffs thereafter filed an amended complaint, and defendant once again moved to dismiss. Notably, in the amended complaint, plaintiffs asserted claims for breach of contract, negligent misrepresentation, and fraud. The Court granted in part and denied in part defendant's second motion to dismiss in *McAfee v. Francis* ("*McAfee II*"), 2012 WL 762118 (N.D. Cal. Mar. 6, 2012). On joinder, the Court held that plaintiffs' breach of contract claims were "predicated on different transactions and occurrences," as each plaintiff had a separate contract with each defendant. "However, some courts have concluded that even when the underlying *contract* claims are predicated on different transactions and occurrences, allegations of *fraud and misrepresentation* may constitute a transaction or series of transactions under Rule 20(a) when they are part of a common scheme." *Id.* The Court agreed with this approach, and held that the amended complaint's allegations of a common fraudulent scheme were sufficient to constitute a "logical relationship" for purposes of Rule 20(a). *Id.*

Unlike *McAfee*, violations of the Wiretap Act do not sound in fraud. As the Third Circuit has explained, "[t]he Wiretap Act is a wiretapping statute, and just because a scenario sounds in fraud or deceit does not mean it sounds in wiretapping." *In re Google Inc. Cookie Placement Cons. Privacy Litig.*, 806 F.3d 125, 144 (3d Cir. 2015). Neither Plaintiffs nor Public Citizen cites any case where courts have applied the "fraud" or "misrepresentation" rule employed in *McAfee II*

United States District Court
Northern District of California

to the Wiretap Act, and the Court has found none in its own research.

To summarize, because Plaintiffs have failed to meet the same transaction or occurrence requirement, the Court finds that Plaintiffs have been misjoined in the *Corley* and *Amaral* cases. Because Plaintiffs have not met the same transaction or occurrence requirement, the Court need not address whether Plaintiffs have satisfied Rule 20(a)'s second requirement—that there be a common question of law or fact.[5]

### B. Fundamental Fairness

As noted above, the Court may, in the interest of fundamental fairness and justice, dismiss or sever parties even if the Rule 20(a) requirements are satisfied. Here, the Court finds that, if the *Corley* and *Amaral* actions were to proceed as is, joinder (1) would cause prejudice to Google and result in jury confusion, (2) would be impractical, and (3) would avoid proper payment of fees. For these reasons, the Court finds that dismissal or severance would better comport with principles of fundamental fairness and would better advance the administration of justice.

### 1. Prejudice to Google and Jury Confusion

First, keeping 879 Plaintiffs in these actions would cause significant prejudice to Google. Indeed, several courts have found substantial prejudice where a "defendant's defense would, in effect, require [hundreds of] mini-trial[s]." *Hard Drive Prods., Inc. v. Does 1–188*, 809 F. Supp. 2d 1150, 1164 (N.D. Cal. 2011). In addition, in evaluating the likelihood of prejudice, the Ninth Circuit has advised courts to consider the "danger of jury confusion." *Coleman*, 232 F.3d at 1296. Thus, in *Coleman*, the Ninth Circuit determined that certain plaintiffs were misjoined where all ten plaintiffs had alleged age discrimination against the same employer. *Id.* As the Ninth Circuit

---

[5] The Court notes that Google's briefing does not develop any specific arguments in response to the common question of law or fact requirement. *See* Reply at 3 (challenging only same transaction or occurrence requirement). Moreover, Google did not challenge commonality in opposing class certification, and some courts have held that Rule 23(a)(2)'s commonality requirement and Rule 20(a)'s common question of law or fact requirement are one and the same. *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1202 n.46 (11th Cir. 2007) (treating 23(a)(2) and Rule 20(a) as functionally equivalent) (citations omitted). Under these circumstances, the Court would likely find that Plaintiffs had satisfied Rule 20(a)'s common question of law or fact requirement.

21

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

explained, defendant "would be prejudiced by having all ten plaintiffs testify in [a single] trial" because "even the strongest jury instructions [can] not . . . dull[] the impact of a parade of witnesses, each recounting his contention that defendant laid him off because of his age." *Id.*

Both concerns—the potential for hundreds of mini-trials and the likelihood of jury confusion—are at play here. As has been discussed, if all 879 Plaintiffs were to remain joined, Google would potentially have to take discovery of each Plaintiff, investigate the disclosures made by each educational institution, and determine whether to file hundreds if not thousands of pretrial motions. All of these obstacles have been magnified even more by the deficiencies in the FAC. As Google's counsel has noted, the FAC does not provide Plaintiffs' individual e-mail addresses. Hr'g Tr. at 31. It is therefore difficult, if not impossible, for Google to "try to answer" Plaintiffs' claims. *Id.* In moving to sever, Google reiterates that "the sheer volume of Plaintiffs and GAFE institutions, each with different fact patterns requiring review for liability and damages, would prejudice Google . . . if Plaintiffs' claims were tried together." Mot. at 10.

Moreover, on jury confusion, the Court notes that if this case were to go to trial, and if Google were to argue the consent exception, the jury would potentially have to keep track of the facts and circumstances of 879 different Plaintiffs. Moreover, the jury would have to consider and analyze different privacy policies to reflect the diversity of disclosures in this litigation. *See Wynn*, 234 F. Supp. 2d at 1089 ("A single trial would present the jury with the hopeless task of trying to discern who did and said what to whom and for what reason.").

Plaintiffs do not present a persuasive counterargument to this point. In fact, Plaintiffs simply contend that few cases go to trial, and that the Court need not consider jury confusion at this stage of litigation. Plaintiffs' arguments fail to comport with Ninth Circuit precedent, which expressly instructs courts to consider the risk of jury confusion in evaluating prejudice to the parties when analyzing misjoinder. *See Coleman*, 232 F.3d at 1296 (stating that court should examine "danger of jury confusion" in misjoinder analysis). Further, any additional delay on the issue of joinder would only cause the Court and the parties more difficulty in the future, as this

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

action moves through fact and expert discovery, pretrial proceedings, and trial. Accordingly, contrary to Plaintiffs' contentions, the Court finds that jury confusion and unfair prejudice to Google would result if all 879 Plaintiffs remained in these two actions.

### 2. Impracticality of Joinder

Second, it would be impractical to litigate all 879 Plaintiffs' claims together. The sheer number of Plaintiffs, combined with their geographic diversity, would impede effective case management and would not promote judicial economy.

As to the sheer number of Plaintiffs, the Court finds instructive the *Bridgeport Music, Inc. v. 11C Music*, 202 F.R.D. 229 (M.D. Tenn. 2001), decision. In *Bridgeport*, the court granted defendants' motion to sever 770 plaintiffs. In so doing, the court noted that, "[a]s a practical matter, this case is unmanageable in its current form." *Id.* at 232. "Because this Court's courtroom would seat only a small fraction of [d]efendants and their attorneys, it cannot even hold a hearing on the motions currently pending; it cannot host a management conference; it certainly cannot try all—or even most—of the [p]laintiffs' counts together." *Id.*; *see also Hard Drive Prods.*, 809 F. Supp. 2d at 1164 (finding misjoinder based on presence of 188 defendants).

The instant action, which involves 879 Plaintiffs, would present even more logistical hurdles than in *Bridgeport*. Plaintiffs' counsel, indeed, has already admitted that it would be both impractical and inefficient to require that all 879 Plaintiffs be deposed. Plaintiffs' counsel, moreover, has provided no plan as to what the Court should do if all 879 Plaintiffs were required to attend a pretrial hearing or if all (or even a fraction of the) 879 Plaintiffs elected to attend trial.

Case law interpreting Federal Rule of Civil Procedure 23(a)(1), commonly known as the numerosity requirement, provides yet another indicator as to the impracticality of joinder. This requirement states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no "'magic number' that will satisfy the Rule 23(a)(1) prerequisite in every case." Newberg on Class Actions § 3:12 (5th ed. 2016). "As a

23

general guideline, however," a class "of 40 or more members raises a presumption of impracticability of joinder." *Id.*; *see, e.g.*, *Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014) ("Numerosity is presumed for classes larger than forty members."); *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015) (same); *Huynh v. Harasz*, 2015 WL 7015567, *5 (N.D. Cal. Nov. 12, 2015) (same).  Having 879 Plaintiffs spread across two case dockets far exceeds this general guideline, particularly given the individualized inquiries necessary in the instant cases.

Aside from the total number of Plaintiffs, the Court also observes that Plaintiffs reside in states across the country, from Massachusetts to Ohio to California.  FAC ¶ 17(1), 17(6), 17(450). Numerous courts have held that, "[i]n assessing impracticality of joinder," the court should "consider factors such as the geographical diversity of [parties]." *McCluskey v. Trs. of Red Dot Corp. Emp. Stock Ownership Plan and Trust*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (internal quotation marks omitted); *accord Pole v. Estenson Logistics, LLC*, 2016 WL 4238635, *5 (C.D. Cal. Aug. 10, 2016) (same).  Geographic diversity may make it more difficult for the Court to hold hearings, for the parties to conduct discovery, and for the parties to attend trial and pretrial proceedings.  Hence, the geographic diversity of Plaintiffs weighs against mass joinder.

The logistical hurdles described above are not mere hypotheticals.  After Plaintiffs filed the FAC in *Corley*—without the Court's authorization—these 700 different names had to be inputted into the Court's Electronic Case Filing ("ECF") system.  This input took place over two days, March 16 and 17, 2016.  Over 700 names were again inputted into the ECF system after Plaintiffs filed their proposed protective order on May 13, 2016.  These burdens will continue through discovery, pretrial proceedings and trial.  *Hard Drive Prods.*, 809 F. Supp. 2d at 1164 (declining to allow joinder because joinder "would result in a logistically unmanageable case" and would not "promot[e] judicial economy and trial convenience").

In an attempt to counter these impracticability concerns, Public Citizen cites several cases where courts have "entertained suits with hundreds of plaintiffs joined together in one action under

24

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

1    Rule 20." Public Citizen Opp'n at 3. None of these decisions, however, even address the

2    propriety of joinder. Instead, all of these decisions focused on whether federal subject matter

3    jurisdiction was proper.

4          Five cases involved motions to remand under the Class Action Fairness Act ("CAFA"),

5    and the remaining case involved a motion to remand under the Price Anderson Act ("PCA").

6    Neither Plaintiffs nor Google, on the other hand, have filed a motion to remand or challenged

7    whether federal subject matter jurisdiction is proper.

8          In two of the cases cited by Public Citizen, the court found that remand was appropriate.

9    As such, the matter could not remain in federal court, and the court could not consider joinder

10   issues. *See Armstead v. Multi-Chem Gp., LLC.*, 2012 WL 1866862, *1 (W.D. La. May 21, 2012)

11   (granting motion to remand); *Aburto v. Midland Credit Mgmt., Inc.*, 2009 WL 4884147, *1 (N.D.

12   Tex. Dec. 16, 2009) (same).

13         In three of the remaining four decisions, the court did not even mention Rule 20(a), much

14   less engage in any sort of discussion on joinder. *See Bullard v. Burlington N. Santa Fe Ry. Co.*,

15   535 F.3d 759 (7th Cir. 2008) (finding CAFA jurisdiction); *Acuna v. Brown & Root Co.*, 200 F.3d

16   335 (5th Cir. 2000) (finding jurisdiction under PCA); *Adams v. Macon Cnty. Greyhound Park,*

17   *Inc.*, 2011 WL 5513210 (M.D. Ala. Nov. 10, 2011) (finding CAFA jurisdiction). Lastly, in

18   *Gilmore v. Bayer Corp.*, 2009 WL 4789406, *3 (S.D. Ill. Dec. 9, 2009), a putative class action

19   case involving 100 plaintiffs, the district court limited its Rule 20(a) discussion to whether

20   plaintiffs had presented common questions of law and fact as to the side effects of a particular

21   drug. The *Gilmore* court did not determine whether plaintiffs' claims arose from the same

22   transaction or occurrence, or whether joinder was fundamentally fair. Moreover, the *Gilmore*

23   court focused not on Rule 20(a)—its joinder discussion was a mere three sentences long—but on

24   whether plaintiffs had sufficiently met CAFA's amount-in-controversy and minimum diversity

25   requirements. *Id.*

26         Accordingly, none of the cases Public Citizen cites supports a finding of joinder in the

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

25

present case.  These cases address federal subject matter jurisdiction, an issue that has not been

contested here.  None of these cases involve an instance where class certification was previously

denied, as it has been in the instant cases.  In fact, all of the CAFA cases were putative class

actions.  After convening two hearings, examining two rounds of briefing, reviewing Public

Citizen's amicus brief, and conducting its own research, the Court reaches the same conclusion as

that of the Fifth Circuit in *Acevedo*: the Court has failed to identify "any cases in which a group of

plaintiffs even remotely as numerous as 800 were able to join their claims."  600 F.3d at 522.

### 3.  Avoidance of Fees

Finally, several courts have found misjoinder where a party's actions appear to be

motivated by an attempt to avoid filing fees.  In *CineTel Films, Inc. v. Does 1–1052*, 853 F. Supp.

2d 545, 554 n.4 (D. Md. 2012), for instance, the district court noted that the judicial burden in

mass joinder cases is "compounded by the fact that the increased work resulting from mass joinder

requires no additional payment beyond the one-time . . . filing fee.  Plaintiffs therefore in no way

compensate financially for [their] significant drain on judicial resources."  Placing such an

"enormous burden" on the parties and the court does not promote "the administration of justice."

*Id.* at 554.

Likewise, in *IO Group, Inc. v. Does 1–435*, 2011 WL 445043, *6 n.5 (N.D. Cal. Feb. 3,

2011), the district court noted that mass joinder, if left unchecked, would effectively "encourage

[p]laintiffs . . . to join (or misjoin) as many doe defendants as possible," all while allowing

plaintiffs to dodge "filing fees."  Thus, "filing one mass action in order to identify hundreds of doe

defendants through pre-service discovery and [to then] facilitate mass settlement," all through a

single filing fee, does not promote the purposes underlying joinder.  *Id.* at *6.

Here, Plaintiffs' counsel has admitted that he chose to join all 879 Plaintiffs because

"requiring Plaintiffs to pay $282,800 in filing fees and to file and litigate more than 700+ virtually

identical individual actions [would] amount[] to a disproportionate and unwarranted burden."

Opp'n at 13.  While Plaintiffs' counsel might have relieved himself of "a disproportionate and

26

United States District Court
Northern District of California

1    unwarranted burden," he has imposed "a disproportionate and unwarranted burden" on everyone

2    else.  As discussed above, Google faces an increased burden in terms of discovery, analysis of the

3    consent exemption, and preparation for trial.  The Court must also address how to move these

4    cases forward in a fair, judicious, and efficient manner—a unique challenge given the 879

5    Plaintiffs with individual claims.

6         Moreover, if Plaintiffs in fact lacked the financial resources to file a new set of complaints,

7    Plaintiffs could avail themselves of the same opportunity offered to other litigants: an application

8    to proceed in forma pauperis.  Under the federal in forma pauperis statute, a court may authorize

9    the commencement of a suit without prepayment of the filing fee required by the clerk of the court

10   if the plaintiff submits an affidavit of poverty showing that he or she is "unable to pay such fees or

11   give security therefor."  28 U.S.C. § 1915(a); *see also* Civil L.R. 3-10 (providing in forma

12   pauperis procedures for Northern District of California).  The Court raised this point at the initial

13   case management conference on April 20, 2016.  In the four months since, Plaintiffs' counsel has

14   yet to address why the in forma pauperis procedure would not alleviate their financial burden.

15   Accordingly, consistent with the reasoning in *CineTel* and *IO Group*, the Court finds that

16   Plaintiffs' counsel's attempt to avoid paying filing fees also weighs in Google's favor.

17        To conclude, if the *Corley* and *Amaral* cases were to proceed as is, there is a significant

18   risk of jury confusion and prejudice to Google.  Mass joinder would also be impractical, and

19   would allow Plaintiffs to impose an unjustified burden on judicial resources.  Given these

20   conditions, mass joinder does not comport with fundamental fairness, and the Court finds that

21   either dismissal or severance is appropriate.

22   **C. Case Management**

23        Having determined that joinder is improper, the next issue is how to move this litigation

24   forward.  This issue implicates two separate but related questions.  First, should Plaintiffs be

25   severed, or dismissed without prejudice?  Second, should Plaintiffs be required to proceed

26   individually, through individual, separate complaints, or allowed to proceed by educational

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

27

1    institution or some other grouping?  The Court addresses these questions in turn.

2            **1.  Severance vs. Dismissal**

3            Federal Rule of Civil Procedure 21 provides that "[m]isjoinder of parties is not a ground

4    for dismissing an action.  On motion or on its own, the court may at any time, on just terms, add or

5    drop a party."  Fed. R. Civ. P. 21.  Alternatively, "[t]he court may . . . sever any claim against a

6    party."  *Id.*  "The effect of each option is quite different.  When a court 'drops' a [party] under

7    Rule 21, that [party] is dismissed from the case without prejudice."  *DirecTV, Inc. v. Leto*, 467

8    F.3d 842, 845 (3d Cir. 2006).  "When that occurs, the statute of limitations is not tolled because

9    we treat the initial complaint as if it never existed."  *Id.* (internal quotation marks omitted).  "But

10   when a court 'severs' a claim against a [party] under Rule 21, the suit simply continues against the

11   severed [party] in another guise."  *Id.*  "The statute of limitations is held in abeyance, and the

12   severed suit can proceed so long as it initially was filed within the limitations period."  *Id.*

13           "Because a district court's decision to remedy misjoinder by dropping and dismissing a

14   party, rather than severing the relevant claim [or party], may have important and potentially

15   adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss

16   under Rule 21 is restricted to what is 'just.'"  *Id.*  "[D]istrict courts who dismiss rather than sever

17   must conduct a prejudice analysis, including loss of otherwise timely claims if new suits are

18   blocked by statutes of limitations."  *Rush v. Sport Chalet, Inc.*, 779 F.3d 973, 975 (9th Cir. 2015)

19   (internal quotation marks omitted).

20           In the present cases, the severance or dismissal decision does implicate the statute of

21   limitations.  Google ceased scanning GAFE emails on April 30, 2014.  The Wiretap Act has a

22   two-year statute of limitations.  Both the *Corley* case, filed on January 27, 2016, and the *Amaral*

23   case, filed on April 29, 2016, fall within this statute of limitations, which would fall on April 30,

24   2016.  However, if the Court were to dismiss all but the original three Plaintiffs in *Corley*, the

25   statute of limitations would likely bar the other 876 Plaintiffs from bringing suit.

26           At least some district courts in the Ninth Circuit have concluded that "any prejudice

27

28   Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

28

1  resulting from the statute of limitations is the risk assumed by the parties who caused the

2  misjoinder." *Robinson v. Geithner*, 2011 WL 66158, *9 (E.D. Cal. Jan. 10, 2011); *accord*

3  *Funatanilla v. Tristan*, 2010 WL 1267133, *6 (E.D. Cal. Mar. 30, 2010) ("[A]ny prejudice

4  resulting from the statute of limitations is a result of [p]laintiff combining seven unrelated claims

5  in one complaint, instead of filing seven separate actions.").

6          Here, there is some evidence that Plaintiffs' counsel assumed the risk that the Court would

7  find misjoinder.  At the April 20, 2016 initial case management conference, when Plaintiffs'

8  counsel stated his intention to file another case with several hundred Plaintiffs, each with

9  individual claims, the Court informed counsel that he could not do so because doing so would be

10 "improper."  Hr'g Tr. at 31.  Plaintiffs' counsel then stated that he would "file it in Superior Court

11 and presumably Google will remove it."  *Id.* at 32.

12          After the April 20, 2016 initial case management conference, Plaintiffs and Google filed

13 on April 25, 2016 and April 26, 2016, respectively, briefs addressing the propriety of mass

14 joinder.  Plaintiffs' counsel confirmed at the April 28, 2016 case management conference that he

15 would file another case with more than a hundred Plaintiffs in state court.  ECF No. 85 at 4.  That

16 case, filed on April 29, 2016 in Santa Clara County Superior Court, was *Amaral*.

17          Thus, prior to April 30, 2016, the Wiretap Act's statute of limitations deadline, Plaintiffs'

18 counsel (1) learned the relevant law regarding joinder in order to prepare his April 25, 2016 brief,

19 and (2) knew that the complaints in *Corley* and *Amaral* may have been improper.  Nevertheless,

20 Plaintiffs' counsel proceeded to file *Amaral* in state court on April 29, 2016, and decided not to

21 separate Plaintiffs in *Corley* into separate complaints.

22          Two considerations, however, weigh against dismissal.  First, the instant actions present

23 several novel legal questions.  No other court has addressed mass joinder in the Wiretap Act

24 context.  Public Citizen's amicus brief further highlights the fact that the instant motions raise

25 novel legal issues.  Second, although the Ninth Circuit has not squarely addressed the issue, other

26 circuits have generally held that a district court should sever rather than dismiss parties when the

27

28

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

statute of limitations comes into play.  In *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000), for instance, the Seventh Circuit stated that "[t]he district judge could and should have allowed [plaintiff's] claim against [defendant] to continue as a separate suit so that it would not be time-barred."  The *Elmore* court cited case law from the Third Circuit to support its conclusion.

Consequently, given the fact that the instant case presents novel legal issues and that other courts generally caution against dismissal, the Court declines to dismiss 876 Plaintiffs.  Instead, Plaintiffs shall be severed, pursuant to the approach outlined below.

### 2.  Proceeding Through Individual Complaints

Plaintiffs, if they elect to continue with this litigation, should prosecute their claims by individual Plaintiff.  This means that the three original Plaintiffs—Ryan Corley, William Dormann, and Shannon Mehaffey—would remain in one action, but that the other 876 Plaintiffs would be severed, and Plaintiffs' counsel would need to file 876 additional complaints.

Each complaint must include specific factual allegations, which at a minimum would include each Plaintiff's GAFE email address, when each Plaintiff signed up for GAFE, what each Plaintiff saw and read in deciding to sign up for GAFE, and whether each Plaintiff ever changed his GAFE settings to allow or prevent Google's interception and scanning.  The Court reaches this conclusion based on the following six considerations.

First, as outlined above, Plaintiffs have failed to meet the same transaction or occurrence requirement.  Pursuant to the Ninth Circuit's ruling in *Visendi*, there is a lack of factual similarity amongst the joined Plaintiffs.  733 F.3d at 870.  Each Plaintiff's case rests upon an individualized consent analysis.  Did a Plaintiff read a particular policy? Did those policies change over time? Did a Plaintiff change his or her privacy settings?  Did a Plaintiff hear about Google's practices through a third-party media source?  These questions must be examined on a Plaintiff by Plaintiff basis.

Second, the Court has considered severance by educational institution—an option advocated by Plaintiffs and Public Counsel—but finds that this option does not meaningfully

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

United States District Court
Northern District of California

United States District Court
Northern District of California

1  address the same transaction or occurrence requirement or the fairness concerns discussed in this

2  Order.  Of the 879 Plaintiffs, 243 are affiliated with the University of California, Santa Cruz; 90

3  with the University of Arizona; 83 with the University of Michigan; 77 with New York

4  University; 69 with the University of California, Berkeley; and 56 with New York University.

5  ECF No. 129 at 3.  An action involving 243, 90, 83, 77, 69, or 56 individual claims would be

6  unmanageable given the individualized inquiries necessary in the instant cases.

7        Third, and relatedly, severance by school would likely result in even more motions to

8  sever.  Google has in fact stated that "school-based actions would still present the individualized

9  questions of whether each Plaintiff . . . consented to Google's automated processing."  Reply at

10  14.  The *Corley* case was originally filed on January 27, 2016.  In the seven months since, the

11  Court has, for purposes of addressing the issue of joinder, held three case management

12  conferences focused on joinder, reviewed multiple rounds of briefing, and received an amicus

13  brief.  If the Court were to sever by educational institution, and if Google were to file another set

14  of motions to sever, it would take months before the Court could turn to the fundamental merits of

15  Plaintiffs' claim.  That would disserve the parties, the Court, and the general public.

16        Fourth, the Court has provided Plaintiffs' counsel ample opportunity to address potential

17  issues involving misjoinder.  Plaintiffs' counsel was, as an initial matter, never even authorized to

18  file the *Corley* FAC, which added over 700 Plaintiffs.  Next, at the April 20, 2016 case

19  management conference, the Court stated that Plaintiffs' counsel's filing of another case with

20  several hundred Plaintiffs, each with individual claims, would be improper given the numerous

21  unresolved issues concerning joinder in *Corley*.  After the April 20 and 28, 2016 case management

22  conferences, Plaintiffs' counsel filed *Amaral*, a case in state court with 175 Plaintiffs on April 29,

23  2016, even though Plaintiffs' counsel knew the case would be removed to federal court and related

24  to the *Corley* case before the undersigned judge.

25        Fifth, such a decision is consistent with the reasoning in *Gmail*.  In *Gmail*, the Court

26  examined the differences between the disclosures provided at each university. The Court, for

27

28  Case No. 16-CV-00473-LHK
     Case No. 16-CV-02553-LHK
     ORDER GRANTING MOTIONS TO SEVER

31

instance, compared the privacy policies of the University of Hawaii with those of the University of California, Santa Cruz.  2014 WL 1102660, *6.  However, as the Court also pointed out, both GAFE and non-GAFE users may have also "learned of Google's interceptions" from a "panoply of [other] sources."  *Id.* at *17.  Google's practices were, for instance, subject to media scrutiny.  *Id.* at n.12.  Thus, "[a] fact-finder, in determining whether [an individual] consented, would have to evaluate to which of the various sources each individual user had been exposed and whether each individual knew about and consented to the interception based on the sources to which she was exposed."  *Id.* at *18 (internal quotation marks omitted).

Sixth, and finally, Plaintiffs' counsel has had ample time to prepare and look into the specific factual allegations that pertain to each Plaintiff.  Over the past five months, Plaintiffs' counsel has been well aware that the Court may sever Plaintiffs, and that the FAC lacked sufficient factual specificity as to each Plaintiff.

Nonetheless, the Court recognizes the unique nature of this case and is cognizant of the inherent difficulties in filing 876 individual complaints.  Accordingly, although the Court's general practice is to provide parties 30 days to file an amended pleading, the Court will grant Plaintiffs' request for extra time, which Plaintiffs' counsel made at the August 18, 2016 case management conference.  Thus, if Plaintiffs elect to proceed in this litigation, Plaintiffs must file 876 complaints within 45 days of this Order.

## IV.   CONCLUSION

For the foregoing reasons, Google's motions to sever are GRANTED.  All but the original three Plaintiffs—Ryan Corley, William Dormann, and Shannon Mehaffey—are SEVERED.  Should the other 876 Plaintiffs elect to proceed with their claims, Plaintiffs' counsel shall file 876 individual complaints.  Plaintiff shall do so within 45 of this Order.  Failure to meet this 45-day deadline will result in a dismissal of the 876 Plaintiffs' claims with prejudice.  Plaintiffs may not add new causes of actions or parties without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure 15.

32

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER

1    **IT IS SO ORDERED.**

2    Dated:  August 19, 2016.

3    _____

4    LUCY H. KOH
     United States District Judge

United States District Court
Northern District of California

Case No. 16-CV-00473-LHK
Case No. 16-CV-02553-LHK
ORDER GRANTING MOTIONS TO SEVER